IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -v-

                                    12-CR-311-A

KENNETH GRAHAM,

               Defendant.

_____

## GOVERNMENT'S SENTENCING MEMORANDUM

**THE UNITED STATES OF AMERICA**, by and through its attorney, William J. Hochul, Jr., United States Attorney for the Western District of New York, and Trini E. Ross, the undersigned Assistant United States Attorney, respectfully files this sentencing statement.[1]

## PRELIMINARY STATEMENT

On August 29, 2012, United States Magistrate Judge Hugh B. Scott (Judge Scott) signed a criminal complaint against KENNETH GRAHAM.   The defendant appeared in court on August 30, 2012, was advised of the charges pending against him, the possible penalties resulting from the charges, and received a copy of the complaint. The defendant was further advised of his right to a preliminary hearing. (Minute Entry dated 8/30/12).

On September 6. 2012, the defendant retained attorney Michael Deal to represent him.   (Minute Entry dated 9/6/12).   On September 10, 2012, Mr. Deal requested more time

---

[1] It should be noted that the defendant has not filed any sentencing statement as of the date of this filing.

to consult with the defendant about the detention and preliminary hearings.   (Minute Entry dated 9/10/12).

The preliminary and detention hearings were held on September 14, 2012. Subsequent to the hearings, Judge Scott held that there was probable cause to believe that the defendant violated Title 18, United States Code, Section 1591(a)(2) and held that the defendant should be detained. (Minute Entry dated 9/14/12).   The defendant was indicted on September 28, 2012, (Docket Number 3) and arraigned on October 5, 2012 (Minute Entry dated 10/5/12).   A superseding indictment was returned against the defendant on November 16, 2012 (Docket Number 7) and the defendant was arraigned on the superseding indictment on November 21, 2012. (Minute Entry dated 11/21/12).

On November 21, 2012, the government filed a motion to set a trial date (Docket Number 8).   On December 10, 2012, a conference was held with District Court Judge Richard J. Arcara to set a trial date.   The trial was scheduled to commence on January 8, 2013. (Minute Entry dated 12/10/12).

Jury selection commenced on January 8, 2013 (Minute Entry dated 1/8/13) and the proof began on January 9, 2013. (Minute Entry dated 1/9/13).   The jury returned a verdict on January 17, 2013, finding the defendant guilty of all three counts in the superseding indictment. (Minute Entry dated 1/17/13).   The forfeiture phase of the trial was commenced

2

on January 17, 2013 and the jury found that the defendant owed forfeiture in the amount of $80,000.   (Minute Entry dated 1/17/13).

On May 28, 2013, attorney Robert N. Convissar became attorney of record for the defendant and attorney Michael Deal was removed as the defendant's attorney. (Minute Entry dated 5/28/13).   On October 28, 2013, the defendant filed a motion requesting a new trial. (Docket Number 60).   The motion was denied by the Court and a sentencing date was scheduled. (Docket Number 90).   The defendant made a motion to adjourn the sentencing date, which the Court granted and a new sentencing date of July 17, 2015 was scheduled. (Docket Number 93).

On May 11, 2015, a Revised Presentence Report ("RPSR") determined that the total offense level in this case should be 43 (RPSR ¶79).   The RPSR also determined that the defendant had a criminal history category of II. (RPSR ¶90).   As a result, the RPSR determined the defendant's sentencing range as life.   (RPSR ¶108).

## STATEMENT OF FACTS

The government concurs with and relies on the very detailed statement of facts set forth in the RPSR at paragraphs 11 through 40.   In addition, the government asks the Court to pay particular attention to the testimony of the victims who testified during the trial, in addition to the other witnesses presented by the government, as well as the sworn statement of Victim 2 in the RPSR ¶ 26.

GRAHAM victimized three young females by recruiting and enticing them to commit acts of prostitution.   Two of the three victims were minors at the time GRAHAM recruited and forced them to commit acts of prostitution.   After recruiting the three victims, GRAHAM posted advertisements on the website "Backpage.com" in the escort services section to solicit customers for the victims.

Victim 2 stated that she met GRAHAM in 2011 when she was 16 years old. GRAHAM was aware of Victim 2's young age when they met.   At first, GRAHAM treated Victim 2 like she was his girlfriend, taking her to movies and dinners.   Eventually Victim 2 moved in with, and began to live with, GRAHAM.   Several months after Victim 2 move in, GRAHAM became abusive towards her, hitting her when she did not obey what GRAHAM told her to do.   Victim 2 was forced by GRAHAM to engage in prostitution activity. GRAHAM would keep the money that Victim 2 received as a result of this activity. Although Victim 2 did not want to work as a prostitute for GRAHAM, and tried to escape from him on several occasions, he would find her and force her to come back.   GRAHAM was physically abusive to Victim 2 and on occasion choked, punched and grabbed Victim 2's hair.

On one occasion Victim 2 was able to escape GRAHAM by fleeing to her sister's house, located in Albany, New York, in the middle of the night, with nothing but the clothes on her back.   Victim 2 subsequently contacted GRAHAM and asked him for her clothing, possessions and important documents such as her and her child's birth certificates.   Once in

Albany, GRAHAM convinced Victim 2 to get into the car with him, under false pretenses, and when she did GRAHAM began driving on Interstate 90 toward Buffalo.   GRAHAM threatened to harm Victim 2 if she tried to escape.

On another occasion in March 2012, Victim 2 left GRAHAM and hid from him at a friend's house located in Buffalo, New York.   When GRAHAM located Victim 2 at this house, he barged into the house looking for her.   Victim 2 hid in the basement while others got GRAHAM out of the house and called the police who arrested GRAHAM as a result of the incident.   Subsequent to this incident, in March 2012, Victim 2 left Buffalo and moved to Florida with her mother for approximately three months to escape from GRAHAM.

In August of 2012 GRAHAM located Victim 2 and after getting her to go to his apartment, would not let her leave.   GRAHAM again forced her to engage in prostitution and would post ads on Backpage.com for men to contact her, under assumed names. GRAHAM kept all the money paid to Victim 2 for prostitution.

Victim 1 began working for GRAHAM as a prostitute in July of 2011.   Shortly thereafter GRAHAM began physically abusing her and forced Victim 1 to engage in acts of prostitution for him, against her will, at various hotels in Amherst, New York.   When Victim 1 refused to work, GRAHAM would punch her, pull her hair and throw her against the wall. Victim 1 freed herself from GRAHAM in 2011.

In August of 2012, Victim 1 reencountered GRAHAM and, after a conversation with GRAHAM at his vehicle, asked GRAHAM to drive her home.   Instead of taking her home, GRAHAM told Victim 1 that she owed him money, although Victim 1 insisted that she did not.   Afraid to get on his bad side and fearing abuse from GRAHAM since he had abused her in the past, Victim 1 complied with GRAHAM's demands to work as a prostitute. GRAHAM drove her to a residence in Orchard Park, New York, and forced her to engage in a commercial sex act with an individual at that residence.   The individual paid $280 for the commercial sex act and GRAHAM gave Victim 1 $40 from the amount paid.

GRAHAM met Victim 3 when she was only 15 years old in the winter of 2010-2011. When Victim 3 began working as a prostitute for GRAHAM, he would give her $250 per day, no matter how much she worked or earned on any given day.

## DISCUSSION

I.  **In Considering the §3553(a) Factors, this Court Should Conclude That a Guideline Sentence of Imprisonment Provides the Proper Punishment for the Offenses of Conviction**

The government recognizes that since United States v. Booker, 543 U.S. 220 (2005), the sentencing guidelines are advisory rather than statutorily mandated.   However, when imposing a sentence, the Court is required to consider the guidelines, and must fashion a sentence that is consistent with the factors detailed in 18 U.S.C. § 3553(a).   The United States contends that a sentence of life, which is the advisory guideline range, is reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.  See United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress . . . .  It bears noting that the Sentencing Commission is an expert agency whose statutory charge mirrors the § 3553(a) factors that the district courts are required to consider.").   The sentencing court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  A court that imposes a sentence outside the applicable advisory guidelines range must do so on notice to the parties and must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so.   18 U.S.C. § 3553(c).

Based on the § 3553(a) factors, as set forth below, the government respectfully submits that a guideline sentence of life imprisonment is warranted.

### A.  The Nature and Circumstances of the Offense Warrant a Guideline Sentence of Life Imprisonment

As set forth in the RPSR, the defendant recruited and enticed all three victims, two of which were minors, to engage in commercial sex acts using force, and/or threats of force. All of the victims engaged in commercial sex acts for the financial benefit of the defendant. As the Court is no doubt aware, sexual predators, including sex traffickers, often target

potential minor victims because those individuals have come from broken homes, are runaways, and/or are looking for what appears to be a "glamorous life style."   According to the Polaris Project, an international foundation headquartered in Washington, D.C. (www.polarisproject.com):

> Runaways and at-risk youth are targeted by pimps and traffickers for exploitation in the commercial sex industry or different labor or services industries. Pimps and sex traffickers are skilled at manipulating child victims and maintaining control through a combination of deception, lies, feigned affection, threats, and violence.
>
> Pimps manipulate their victims beginning with the initial period of false love and affection. This initial period is critical as with any long-term mind control.   This often includes:
>
> - warmth, gifts, compliments and sexual physical intimacy;
> - elaborate promises of a better life, fast money, and future luxuries;
> - purposeful and premeditated targeting of vulnerability (e.g. runaways, throwaways); and
> - purposeful targeting of minors due to vulnerability, virginity and youthful appearance.

The recitation of facts relating to all three victims in the RPSR reveals that GRAHAM'S conduct was completely within the scenario described on the Polaris Project web-site.

Indeed, the sworn statement by Victim 1 describes a relationship with GRAHAM which started out as a "boyfriend/girlfriend" relationship prior to GRAHAM trafficking her and forcing her into prostitution. Victim 1 stated:

> When I first Kenneth he treated me like his girlfriend. He would take me to dinner and the movies. Kenneth and I had sex several times which included intercourse.   I lived with Kenneth for about seven or eight months. Kenneth then became very abusive towards me.   He would hit me if I didn't cooperate with him.   Kenneth wanted me

to have sexual intercourse with strangers for money that he would keep . . . I did not want to do this and tried to get away from Kenneth on numerous occasions but he would find me and physically force me back to his house.

RPSR ¶26

Similarly, Victim 2 stated that "the defendant was charming . . . [and] she began dating and working as a prostitute for him. . . . [and] when she was no longer interested in working for the defendant, . . . he began physically abusing her in order to force her to engage in prostitution during all hours of the night . . . [and] that if she refused to work the defendant would punch her, pull her hair, and/or throw her up against the wall".   RPSR ¶22.

Victim 3 stated that she met the defendant when she was 15 years old after leaving her home in Batavia and was staying with a friend.   Once Victim 3 began working as a prostitute for the defendant he would provide her with $250.00 per day, no matter how much money she received that day for prostitution related activities.   RPSR ¶17-18.

In addition to the victims listed above, GRAHAM's actions directly harmed the lives of several other individuals, including the friend and of Victim 2, and her friend's family when GRAHAM barged into their home searching for Victim 2.   GRAHAM also affected the sister of Victim 2, who drove to Buffalo from Albany to help Victim 2 escape from GRAHAM, only to be forced back to Buffalo when GRAHAM later coerced Victim 2 into his car, and drove toward Buffalo.   GRAHAM's actions also interfered with the relationship between Victim 2 and her son because his actions forced her to leave Buffalo for several

months so she would be away from GRAHAM and she only returned to the area so she could spend time with her son.   RPSR ¶26.

Based on the horrific acts perpetrated by GRAHAM on the victims in this case, two who were minors at the time GRAHAM trafficked them, the seriousness of the underlying offense, and the scope of harm GRAHAM caused to other people and society because of his crimes, clearly weighs in favor of a sentence of life imprisonment, as promulgated by the Guidelines, for the purposes of punishment and promoting deterrence.   18 U.S.C. § 3553(a)(1).   Such would provide protection to the victims who are terrified of GRAHAM and afraid that he will seek revenge on them should he ever be released.   Such sentence would also protect the people who assisted the victims with escaping from GRAHAM, and would protect other potential victims, the individuals discussed in the Polaris Project cited above.   For these reasons a term of life imprisonment is appropriate.

**B.**     **The History and Characteristics of the Defendant**
            **Warrant a Term of Incarceration of Life**

The defendant's violent history with the victims in the instant case mandates that he be incarcerated for the period of time advised by the Sentencing Guidelines.

In the instant case, the crimes of conviction are particularly heinous and the defendant's characteristics regarding these crimes are extremely disturbing.   Indeed, as stated in detail above, the defendant physically harmed the victims when they told him they no longer wanted to work as prostitutes and tried to get away from him.   They were young,

10

two were teenagers ages 15 and 16 years old, and GRAHAM physically threatened them, physically harmed them, stalked and retrieved Victim 2 on a few occasions, and forced each of them into committing prostitution acts for his monetary gain.   The violence displayed and the lack of basic human decency exhibited by GRAHAM regarding these victims is reason enough to incarcerate him for life.

In addition to the above, the Court should also take into consideration GRAHAM's lack of consideration and respect for the law.   As described in the RPSR, GRAHAM's criminal history includes his first felony arrest when the defendant was 21 years old for grand larceny. He later obtained 5 misdemeanor convictions and has several arrests.   As a result, GRAHAM has 3 criminal history points, and a criminal history score of II.

Based on a review of the RPSR, the facts of this case and the lack of honesty and truthfulness from GRAHAM when he testified during trial, there are no extraordinary characteristics of the defendant that warrant a non-guideline sentence. (Trial Transcript, Graham Testimony, p. 8-38).

In most cases where a non-guideline sentence is granted, the court has before it some evidence that the particular defendant was involved in his community, had served his county in the military, or had led an otherwise exemplary life.   See United States v. Hanson, 561 F.Supp.2d 1004, 1007 (E.D.Wis. 2008) (defendant "held a funeral director's license and operated a funeral home for over twenty years, taking over the business from his father.   He

appeared to have been a successful and well-respected businessman."); <u>United States v. Taylor</u>, 2008 WL 2332314, *1-2 (S.D.N.Y. June 2, 2008) (the defendant had "excelled academically," graduated from the "prestigious Bronx High School of Science," served in the United States Navy for over four years, and received numerous commendation medals); and <u>United States v. Grinbergs</u>, 2008 WL 4191145, *9 (D. Neb. Sept. 8, 2008) (defendant had "served in the Army Reserve and was discharged honorably."). In the present case, GRAHAM presents no mitigating circumstances. The defendant has never been a productive member of society. Rather GRAHAM is a dangerous individual, a human trafficker who forced at least three young women into prostitution by threats and physical assaults. (Trial Transcript, Graham Testimony, p. 23-24). GRAHAM has shown no remorse for his actions and indeed, blamed the victims for his actions during the trial. (Trial Transcript, Graham Testimony, p. 4-6, 12, 26).

Based on the defendant's actions and lack of remorse, a sentence within the Sentencing Guideline's advisory range of life imprisonment should be imposed.

### C.  <u>The Victims are Entitled to Restitution</u>[2]

---

[2] Notwithstanding the forfeiture verdict of $80,000**,** the government is requesting mandatory restitution in addition to the forfeiture since the law is clear that forfeiture and restitution are not mutually exclusive. Numerous courts have upheld sentences which required a defendant to forfeit property and also to pay restitution to the victim. <u>See</u> <u>United States v. Pescatore</u>, 637 F.3d 128, 137 (2d Cir. 2011) (forfeiture and restitution are separate remedies with different purposes; defendant was not entitled to have the government apply $2.5 million in forfeited funds to a $3 million restitution order); <u>United States v. McGinty</u>, 610 F.3d 1242, 1247-48 (10th Cir. 2010) (forfeiture and restitution serve different purposes and both are mandatory; ordering defendant to pay a money judgment equal to the proceeds of his offense and to pay restitution to his victim is not unfair). <u>See also</u> <u>United States v. Torres</u>, 703 F.3d

Pursuant to Title 18, USC, §§ 1593, 3663A and 2259 restitution in this case is mandatory.   Section 1593 mandates that the court order the defendant to pay the full amount of a commercial sex trafficking victim's losses as restitution.   The district court may include in this amount the estimated cost of future medical treatment.   See, United States v. Jennings, 2010 WL 4236643 (W.D.Mo); United States v. Pearson, 570 F.3d 480, 486 (2d. Cir 2009).

Section 1593 requires that the defendant pay the victim "'the full amount of the victim's losses,' defined as the sum of two components: (1) ill-gotten gains plus (2) the 'full amount of the victim's losses,' as defined as '(A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) loss income; (E ) attorney's fees, as well as other cost incurred; and (F) any other losses suffered by the victim as a proximate result of the offense.'" 18 U.S.C. § 2259(b)(3) (incorporated by reference in 18 U.S.C. § 1593(b)(3)).   United States v. In re SEALED CASE, 702 F.3d 59, 66 (U.S.APP.D.C. 2012).   The amount of restitution imposed by the district court need not be proven with exactitude.   "'Determining the dollar amount of a victim's losses attributed to

---

194, 203 (2d Cir. 2012) ("restitution is loss based, while forfeiture is gain based"), quoting United States v. Genova, 333 F.3d 750, 761 (7th Cir. 2003).   Further, the amount of forfeiture and the amount of restitution will often be different.   See Torres at 203 (the measures of forfeiture and restitution are different as their purposes are distinct; in a given case, the amounts may be identical, but they may often be different).

the defendant will often be difficult and such a determination will inevitably involve some degree of approximation which is not fatal". <u>Id</u>. (citations omitted).  The district court's charge is to "'estimate, based upon facts in the record, the amount of [the] victim's loss with some reasonable certainty.'" <u>Id</u>. (citations omitted).

In <u>United States v. Mammedov</u>, 304 Fed.Appx. 922 (2d Cir. 2008), the Court held that victims, who through the "force, fraud or coercion" that caused them "to engage in a commercial sex act, or that a person had not obtained the age of 18 years and was caused to engage in a commercial sex act" are entitled to restitution notwithstanding that the commercial sex act, i.e. – prostitution, is illegal.  The Court further stated that under 18 U.S.C. §1593(c ), "the term 'victim' is defined as 'the individual harm as a result of a crime under this chapter,' including sex trafficking. . . .Thus, the express terms of 18 U.S.C. §1593 require that the victims . . .  i.e., persons who engage in commercial sex acts within the meaning of 18 U.S.C. § 1591, receive restitution, notwithstanding that their earnings came from illegal conduct." <u>Id</u>. at 927.   <u>See also</u>, <u>United States v. Cortes-Castro</u>, 511 Fed.Appx 942, 947 (11th Cir. 2013); <u>United States v. Lewis</u>, 791 F.Supp.2d 81, 94 (D.D.C.);

In the instant case, the government has not received any documentation from the victims of losses they incurred, or of future expenses they will incur, as a result of the commercial sex trafficking they were forced into.   Thus, the government is not requesting restitution based on the victims' losses under Title 18, U.S.C. §1593(2).

14

However, the proof at trial established that GRAHAM forced three victims, two of whom were minors, to engage in illegal commercial sex and that he kept some or all of the money earned by the victims.   Based on the statutes and the law cited above, the victims are entitled to restitution for the money they earned and kept by GRAHAM. as a result of being forced to commit commercial sex acts.

Testimony of the victims revealed that GRAHAM charged approximately $180 to $280 per commercial sex act over a period of time per each victim.[3]   Specifically, Victim 1 met GRAHAM in July 2011 and was forced and/or coerced to work for him by having commercial sex with 5-10 men per day for a period of approximately 10 weeks (1-3 weeks in July; all of August and part of September 2012) and again in August of 2012.   Victim 1 gave all the money she received to GRAHAM.   As a result, Victim 1 is entitled to restitution in the amount $88,440 (this is calculated by 10 customers per day, 7 days a week for 10 weeks x $180 per customer for a total of $126,000, plus $240 for a commercial sex act in she was forced to perform in August 2012 for which GRAHAM gave her $40.00).

With regard to Victim 2, she was forced to work for GRAHAM from September 2011 through February 2012, and again from June 2012 through August 2012.   Victim 2 was also forced to engage in commercial sex with up to 8 men per day, seven days a week.   As a result, Victim 2 is entitled to restitution in the amount of $257,040 (this is calculated by 8

---

[3] Testimony referred to includes grand jury and trial testimony.

customers a day, 7 days a week for 34 weeks x $180 per customer, minus ¼ of the total earned by Victim 2, approximately $342,720, which she was allowed to keep).

Victim 3 was forced to work for GRAHAM from December 2010 for a few weeks and again in May 2012 when she saw two customers.   Victim 3 was also forced to engage in commercial sex with up to 8 men per day, seven days a week.   As a result, Victim 3 is entitled to restitution in the amount of $50,340 (this is calculated by 8 customers a day, 7 days a week for approximately 6 weeks x $180 per customer, plus two customers in May 2012 at $180 per customer for a total of $60,840, minus $250 per day (for a total of $10,500), that Victim 3 was given by GRAHAM).

Based on the above calculation the victims are entitled to restitution in the amount of $395,820.

## CONCLUSION

For the foregoing reasons, and taking into account all of the 18 U.S.C. § 3553 factors, the defendant should be sentenced to a term of incarceration within the advisory guidelines range of life.   In addition, the defendant must be ordered to pay restitution in the amount calculated as $395,820.

**DATED**:   Buffalo, New York, July 13, 2015.

                                   WILLIAM J. HOCHUL, JR.
                                   United States Attorney


                        BY:   s/   TRINI E. ROSS
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   Western District of New York
                                   138 Delaware Avenue
                                   Buffalo, New York 14202
                                   (716) 843-5805
                                   Trini.Ross@usdoj.gov